# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

NO. 03-09-00257-CV

Jesse Calderon and Marixza Melendez, Appellants

v.

Texas Department of Family and Protective Services, Appellee

FROM THE DISTRICT COURT OF TRAVIS COUNTY, 126TH JUDICIAL DISTRICT
NO. D-1-FM-07-001748, HONORABLE STEPHEN YELENOSKY, JUDGE PRESIDING

# M E M O R A N D U M   O P I N I O N

A jury returned a verdict finding that the parental rights of appellants Marixza Melendez and Jesse Calderon to their daughters J.C.C. and J.B.C. should be terminated, and the trial court signed a final decree terminating appellants' parental rights in accordance with the jury's verdict. Both Melendez and Calderon filed notices of appeal, but Melendez's appellate attorney has filed a brief concluding that her appeal is frivolous and that there are no arguable grounds for reversal of the trial court's decree as to Melendez's rights.[1] Calderon argues that the evidence is insufficient to support the trial court's findings that he knowingly placed or allowed the children to remain in conditions that or with people who endangered the children's well-being. *See*

---

[1] Texas courts have held that it is appropriate in a parental termination case to file a brief asserting that the appeal is frivolous. *See, e.g.*, *Matthews v. Texas Dep't of Protective & Regulatory Servs.*, No. 03-04-00184-CV, 2005 Tex. App. LEXIS 1231, at *2 (Tex. App.—Austin Feb. 17, 2005, no pet.) (mem. op.).

Tex. Fam. Code Ann. § 161.001(1)(D), (E) (West Supp. 2009). He further argues that the evidence is insufficient to support a finding that termination is in the children's best interest and that the trial court erred in allowing testimony by J.C.C.'s therapist about a statement the child made about seeing her parents using a "white powder." We affirm the trial court's decree.

## Factual Background

### *Procedural history with the Department*

At the time of trial in April 2009, J.C.C., born in September 2002, was six years old and J.B.C., born in March 2006, was three. The children were taken into the Department's custody in April 2007, about two years before the final hearing.[2] The Department first received a referral concerning the family in November 2006, which alleged that Calderon and Melendez were using drugs in the home and that R.M., Melendez's older son, had run away because he was afraid of being punished physically for getting in trouble at school. The Department investigated and closed the referral as "unable to determine." In January 2007, the Department received another report that the parents were using drugs in the house, and in early April 2007, the family was ordered to participate in services as a result of a juvenile court hearing involving R.M. On April 20, 2007, after Melendez tested positive for opiates, the children were removed and placed with their maternal grandmother. In late May 2007, the Department sought managing conservatorship over the children because caseworkers had been unsuccessful in several attempts to contact the family, Calderon had not submitted to a requested drug test, Melendez tested positive for cocaine and opiates, and the

---

[2] Melendez has four older children who are not part of this proceeding.

2

children's grandmother admitted to the Department that the children were away from the house and with their mother without supervision, which was a violation of the family's safety plan.

For the next two years, Melendez and Calderon largely attempted to comply with the court ordered services, including parenting classes, drug abuse assessments, and drug treatment. However, Calderon was jailed from August 2007 through March 2008 and again from May 15, 2008, until June 5, 2008, when his probation was revoked. While Calderon was incarcerated, Melendez relapsed into cocaine addiction and then became addicted to heroin and dropped out of contact with the children and the Department for several months. On October 8, 2008, the parties entered into a mediated settlement agreement under which the children were returned to Calderon under the condition that Melendez could not have contact with the children until she had complied with several drug-related conditions. The children were returned to Calderon's care on October 31, but on November 1, a Department supervisor saw Calderon drive the children to a store's parking lot, where he picked up Melendez. He then drove to another store and went inside, leaving the children alone with Melendez for about five minutes, in violation of the settlement agreement. He came out of the store and drove off with the children and Melendez; the Department supervisor followed for a few minutes before abandoning her surveillance. Two days later, the Department had the children removed from Calderon's care for his violation of the settlement agreement and decided to abandon reunification efforts and instead seek termination of the parents' rights to the children.

### Calderon's criminal history

The testimony and evidence established that Calderon had a criminal history dating back to 1997, when he was convicted of conspiracy to commit illegal investment and use of a

3

communication facility to commit a felony. Both charges were related to his 1994 involvement in the sale of cocaine, and Calderon was incarcerated from June 1996 until August 1998 for those charges.[3] In June 2001, Calderon pled guilty to a February 2000 charge of cocaine possession and was placed on deferred adjudication.[4] In January 2006, Calderon obtained a doctor's DEA number and attempted to obtain fraudulent prescriptions for cough syrup with phenergan. He was charged with possession of a controlled substance by fraud and placed on deferred adjudication.[5]

In February 2007, police officers went to the residence to serve unrelated arrest warrants on Calderon and Melendez. When the police entered the residence, they saw marihuana paraphernalia in plain view, so they left the house and called the narcotics division to obtain a search warrant. When the warrant was obtained, the police searched the house and found marihuana in a jar stuffed between couch cushions, two water pipes on a coffee table, a handgun in plain view on a sofa or chair cushion, marihuana in a plastic bag in a dresser drawer, magazines and books related to marihuana use and cultivation, body armor, smoke bombs, bullets, a money-counting machine, three scales, and other items often related to the sale of marihuana. At the time of the search, J.C.C. and J.B.C. were living in the house with Calderon, Melendez, and R.M., and an officer testified that

---

[3] Calderon argues that any criminal involvement before the two children were born is irrelevant to whether his rights should be terminated. Although we agree that criminal acts that occurred before the children were born could not be used as the main basis for terminating his rights, we believe that such conduct is relevant to our consideration because his prior convictions could be used to enhance any later criminal sentences and because his criminal history is relevant in evaluating the appropriateness of his choices and lifestyle.

[4] Calderon testified that the drugs were not his but that he was advised to plead guilty due to his criminal background.

[5] Calderon was also charged with assaulting Melendez in 2004 and with assaulting the aunt of Melendez's other children in 2007, but those charges were dismissed.

he remembered that one child was present at the time of the search. Calderon was charged with misdemeanor possession of marihuana and unlawful possession of a firearm; he pled nolo contendere to drug possession and the firearm charge was dismissed. Although Calderon admitted to using marihuana and prescription drugs, he denied using drugs in front of the children. Calderon testified that although most of the items seized in the February 2007 search were his, the drugs and handgun were not in plain sight as the police testified and as portrayed in the Department's photographic exhibits. He said that the water pipes and handgun were hidden at the top of the entertainment cabinet, out of the children's sight and reach, and that the jar of marihuana was hidden in his dresser drawer, not wedged between sofa cushions. In June 2007, after his plea of nolo contendere on the marihuana charge, Calderon's 2001 deferred adjudication for cocaine possession was revoked, his guilt was adjudicated, and he was imprisoned from August 2007 until March 2008.[6] He was released in late March but reimprisoned from May 15 until June 5, 2008, when he was kicked out of the house where he had arranged to live.

In March 2009, Calderon was accused of theft. It was alleged that on March 9, 2009, he went to Wal-Mart and stole a flat-screen television, walking past security without having paid for the television, and that he returned with Melendez on March 14, attempting to do the same thing before being stopped as he left the store. The Department presented testimony by the Wal-Mart loss-prevention officer who detained Calderon and Melendez after the second attempt and a video of

---

[6] Calderon was adjudicated guilty and sentenced to two years' imprisonment due to his plea of nolo contendere and because he failed to report for a probation appointment, do his required community service hours, or pay his required fees and court costs. In July 2007, Calderon's deferred adjudication was also set aside in the case involving the attempt to get fraudulent prescriptions, and he was sentenced to fifty-nine days, running concurrent with the sentence for cocaine possession.

5

security footage showing the store's exit. In the first theft, Calderon was stopped by an employee stationed at the door and asked for a receipt. Calderon went back inside, but then left with the television while the employee was assisting another customer. The second time, the loss-prevention officer recognized Calderon from footage of the first theft, and Calderon was taken into custody as he tried to leave the store with the television. Calderon pled guilty to misdemeanor theft related to the first incident and entered into a plea agreement under which he received one year of probation, community service, and a fine. He admitted that he sold the first television to a friend for $400 but denied that he was attempting to steal a television the second time, saying that Melendez wanted to get the television for her mother and asked him "to put it on lay-away." The loss-prevention officer, however, testified that the Wal-Mart did not have lay-away.

In addition to the March 2009 thefts, the Department alleged that Calderon committed or attempted to commit theft in December 2006, when he went to Wal-Mart with R.M., who was thirteen at the time. The Department alleged that Calderon and R.M. went to a self-checkout line but did not scan all of the items in their cart. As they left, security detained R.M. and told Calderon to stop. Calderon fled and drove away, leaving R.M. behind; R.M. was charged with theft. Calderon denied knowing that R.M. was shoplifting and said he ran because he was scared and did not want to get in trouble because he was on probation. Calderon was not charged in relation to the incident.

The Department also presented testimony by an Austin Police detective assigned to the Major Crimes Task Force, who testified that from 1999 through 2003, the task force conducted an investigation into a violent prison gang. During the investigation, the unit tracked members of the gang, including a confirmed, high-ranking member who "had contact with" Calderon several

times in 2003 at a jewelry store co-owned by Calderon. The detective also testified that there was "some information" Calderon was involved with cocaine distribution but that he was never arrested or charged in conjunction with the investigation. Calderon was asked about a February 2004 robbery of the family's home. Calderon said that at the time, he was earning approximately $40,000 a year at his jewelry store, Melendez was not working, and the robbers took property worth about $300,000, including more than $8,000 in cash, several pieces of expensive jewelry, and six designer-name purses. Calderon and Melendez explained that although the jewelry was very valuable, Calderon bought it for substantially less than its market value due to his involvement in the jewelry business.

### Melendez's drug use

Melendez admitted that she had a drug problem until shortly before trial. Melendez was born in 1975 and testified that she started using cocaine when she was nineteen and used it until she was arrested at twenty-three. She stayed off of drugs "for the most part" while she was on probation for more than six years, until April 2007, relapsing occasionally. The children were removed in May 2007, after Melendez tested positive for cocaine. Throughout the summer of 2007, Melendez stayed off of drugs except for one relapse, but in late September or early October 2007, while Calderon was incarcerated, she began to use cocaine regularly again, snorting and injecting it about every other day. Her cocaine use continued until February 2008, when she started injecting heroin. She soon was using about $200 of heroin, five or six injections, a day; she lied to and borrowed from her father to support her habit. She sought treatment a few times, but kept relapsing until June 2008, when she was admitted into a program that uses methadone for treatment.

7

Melendez testified that she last used cocaine in early 2008, that she last used heroin on September 1, 2008, about seven months before trial, and that she sometimes smoked marihuana.

Although Calderon downplayed his knowledge of Melendez's drug abuse, testifying that he began to think "maybe she was on drugs," there was evidence that he knew she was a drug addict in at least late March or early April 2008, shortly after he was released from custody for parole violations, when he was informed by the Department that Melendez was not allowed to have unsupervised contact with the children. In June 2008, after he was released from his second incarceration for parole violations, he called 911 to report that Melendez had taken his car without his consent shortly before he was incarcerated. A police officer testified that Calderon informed the police that Melendez was a drug user and that they should look for the car at a certain "drug house." Calderon denied telling the police that the car was likely parked at a drug house and said only, "I said I believe that she might have been on drugs."

### Other evidence related to the children's welfare and best interests

J.C.C.'s therapist testified that J.C.C. told her that Calderon and Melendez used drugs and that she had seen "white powder" on a table. J.C.C. said that when her parents used drugs, they acted "weird." J.C.C. would get a headache and would go to her room. A caseworker testified that in late October 2008, J.C.C. said that Calderon had told her to "lie to you about certain things," such as seeing Melendez, "because you [the caseworker] hate her." Further, there was evidence of six domestic disturbances between Calderon and Melendez, dating back to 2001 and as recently as March 2009. Police officers testified to reports of loud arguments or violence, on one occasion made by R.M., and said that when they responded, Melendez denied being assaulted, despite physical signs

8

that violence might have occurred. Calderon and Melendez downplayed those incidents, explaining that they were just loud arguments or misunderstandings and not physically violent fights.

The Department presented testimony by a counselor who Calderon saw several times until therapy was discontinued because Calderon stopped attending scheduled sessions. The therapist testified that Calderon "owned very, very little of his history," never took responsibility for his involvement in the children's removal, and made no progress over the course of his sessions with her. Asked to write a letter explaining his situation, he said that he regretted not being available to J.C.C. and R.M. because he "worked a lot" and "should have made more time" for them and because he "tried to replace material things for my being gone all the time" with work. He did not take responsibility for his behavior and seemed to blame "this whole nightmare" on R.M.'s behavior starting when he turned thirteen and began to get in trouble with the law. She testified that Calderon was "a threat to all children due to his criminal and drug history and his complete lack of accountability," saying, "[W]ould you allow your children to be around someone with that extensive of a criminal history? Would you leave your children in that person's care? Can you imagine putting your children or your grandchildren in that person's care even for two days? And if the answer is no, then that's why I wrote that. That's my assessment of him."

In addition to testimony about Calderon's immediate violation of the settlement agreement upon the return of the children to his care, in 2008 Calderon lied to the Department about his continuing involvement and contact with Melendez. On September 12, 2008, Calderon testified at a permanency review hearing that he had not had recent contact with Melendez, but in August 2008, Department employees saw Melendez drive Calderon in his car to a Department office,

9

where she dropped him off for a visit with the girls and picked him up afterwards. The two then drove to his apartment, got out of the car, and went into the apartment together.

Department caseworkers and the children's CASA volunteer testified that they believed it was in the children's best interest for Melendez's and Calderon's parental rights to be terminated so that the girls could be adopted and have a sense of permanancy in their lives. The CASA volunteer testified that he believed Melendez had an on-going drug problem that she was struggling to address and that Calderon did not intend to raise the children without Melendez, the combination of which put the children at risk should they be returned to their parents' care.

Finally, Melendez admitted that she believed it had endangered the children "to allow Jesse Calderon to use and keep drugs in the home where your children lived." During Calderon's testimony, the following exchange took place:

Q: And do you agree with me that every time you commit a crime you put yourself at risk of having to leave [the children's] lives because of incarceration?

A: Yes, ma'am.

Q: Do you agree with me that that creates a condition that endangered their physical and emotional well-being?

A: Yes, ma'am.

. . . .

Q: And your pending theft charges are from a March 14th, 2009, incident?

A: Well—

Q: So therefore, you are facing—I am not saying you are getting, but you are facing possible incarceration?

10

A: Yes.

Q: And so is Marixza?

A: Yes.

Q: And doesn't that endanger your children?

A: Yes.

Q: Who is going to take care of your children when you are locked up?

A: I don't know.

**Standard of Review**

Calderon argues that the evidence is insufficient to support the jury's findings that there were statutory grounds for termination or that termination was in the children's best interest. He also complains that the trial court erred in allowing J.C.C.'s therapist to testify about the child's statement that she saw white powder on a table.

To terminate a parent's rights to his children, which are of constitutional dimension, *In re J.W.T.*, 872 S.W.2d 189, 194-95 (Tex. 1994), the fact-finder must find clear and convincing evidence that (1) the parent has engaged in the conduct set out as statutory grounds for termination and (2) termination is in the child's best interest. *In re C.H.*, 89 S.W.3d 17, 23 (Tex. 2002); *see* Tex. Fam. Code Ann. § 161.001. "Clear and convincing evidence" is the level of proof required to produce a firm belief that the Department's allegations are true. *C.H.*, 89 S.W.3d at 23. In reviewing a best-interest determination, we consider: the child's wishes, her emotional and physical needs now and in the future, emotional or physical danger posed to the child now and in the future, the parenting skills of those seeking custody, programs available to assist those seeking custody to

11

promote the child's best interest, plans for the child's future, the stability of the home, any conduct by the parent that might show that the existing parent-child relationship is improper or harmful, and any excuse for that conduct. *Holley v. Adams*, 544 S.W.2d 367, 372 (Tex. 1976).

We review legal sufficiency by viewing all of the evidence in the light most favorable to the fact-finder's determination and asking whether a reasonable fact-finder could have formed a firm conviction that its finding was true. *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). We assume that the fact-finder "resolved disputed facts in favor of its finding if a reasonable factfinder could do so" and we disregard evidence "that a reasonable factfinder could have disbelieved or found to have been incredible." *Id.* Issues related to witness credibility, meaning questions that turn on a witness's appearance or demeanor, are left to the fact-finder's determination as long as its determination is reasonable. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005) (quoting *Southwestern Bell Tel. Co. v. Garza*, 164 S.W.3d 607, 625 (Tex. 2004)). If the evidence is legally sufficient, then we review factual sufficiency. Evidence is factually insufficient only if "a reasonable factfinder could not have resolved that disputed evidence in favor of its finding" and if "the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction." *J.F.C.*, 96 S.W.3d at 266.

A trial court's decision to admit or exclude witness testimony is reviewed under an abuse of discretion standard. *Owens-Corning Fiberglas Corp. v. Malone*, 972 S.W.2d 35, 43 (Tex. 1998); *Taylor v. Texas Dep't of Protective & Regulatory Servs.*, 160 S.W.3d 641, 652 (Tex. App.—Austin 2005, pet. denied). An abuse of discretion occurs if the trial court acts unreasonably or arbitrarily, without reference to guiding principles. *Malone*, 972 S.W.2d at 43 (quoting *City of*

12

*Brownsville v. Alvarado*, 897 S.W.2d 750, 754 (Tex. 1995)). We will uphold a trial court's admission or exclusion of evidence unless (1) there was no legitimate basis for the court's ruling, and (2) the error probably caused the rendition of an improper judgment, *id*., and will sustain a trial court's decision to admit or exclude evidence if it is correct under any applicable legal theory, *see Madrigal v. Soliz*, No. 13-02-00465-CV, 2004 Tex. App. LEXIS 7990, at *3 (Tex. App.—Corpus Christi Aug. 31, 2004, no pet.) (mem. op.) (citing *Romero v. State*, 800 S.W.2d 539, 543 (Tex. Crim. App. 1990)). *See also Markel Ins. Co. v. Muzyka*, 293 S.W.3d 380, 385 (Tex. App.—Fort Worth 2009, no pet.) ("regardless of the reasoning employed by the trial court . . ., if the trial court reached the correct result, we will affirm its ruling"); *In re H&R Block Fin. Advisors, Inc.*, 262 S.W.3d 896, 899 (Tex. App.—Houston [14th Dist.] 2008, orig. proceeding) ("Because a trial court cannot abuse its discretion in reaching a correct result for the wrong reasons, we will uphold the trial court's order on any ground supported by the record.").

**Discussion**

First, we address Calderon's complaint that the trial court erred in allowing J.C.C.'s therapist to testify that J.C.C. told her she saw "white powder" during a discussion about whether J.C.C. knew that her parents used drugs.

Hearsay evidence is inadmissible unless it falls within an exception provided by the rules or a statute. Tex. R. Evid. 802. One exception is that a hearsay statement made "for purposes of medical diagnosis or treatment" may be admissible, Tex. R. Evid. 803(4), provided that (1) the declarant knew that the statement was made for the purpose of receiving treatment, and (2) the substance of the statement was pertinent to the treatment or, in other words, the kind of information

13

reasonably relied on by a medical professional for treatment or diagnosis. *See Taylor v. State*, 268 S.W.3d 571, 589, 591 (Tex. Crim. App. 2008). Further, even if otherwise inadmissible, the family code allows the admission of a child's hearsay statement describing alleged abuse against the child if there are sufficient indications of the statement's reliability and the child testifies or is available to testify or the court finds that the statement should be used in lieu of the child's testimony to protect the child's welfare. Tex. Fam. Code Ann. § 104.006 (West 2008). "Abuse" is defined as, inter alia, a genuine threat of substantial harm from physical injury or a person's "current use" of a controlled substance so as to physically, mentally, or emotionally injure a child. *Id.* § 261.001(1)(C), (I) (West 2008).

J.C.C.'s therapist testified that during play therapy, J.C.C., who was about four and one-half years old, pretended that "she was being arrested for drugs that she did, that she did use drugs and she had found them on the—on the sidewalk. They made her feel weird and that—then a baby had used the drugs and it killed the baby." The therapist later returned to the subject, telling J.C.C., "we are being serious now. I have to know, did you ever use drugs?" J.C.C. said she had not but that "her parents did use drugs and she recalled seeing some white powder," indicating that she had seen the powder on a table. When the therapist asked how J.C.C.'s parents acted when they used drugs, J.C.C. said they "would act weird" and that it caused J.C.C. to "always get a headache, so she would go into her room." Before allowing the testimony, the trial court held a hearing outside the jury's presence. During that hearing, the trial court heard testimony from the therapist about the context in which J.C.C. made the statement. The therapist testified that she believed J.C.C. provided truthful information and that it would "[a]bsolutely not" be in J.C.C.'s best interest to have to testify in open court about seeing her parents use drugs.

14

We agree with the trial court that the therapist's testimony about J.C.C.'s statement about white powder was admissible. The therapist testified that she stressed the importance of J.C.C. telling whether she had used or seen her parents use drugs and that she believed J.C.C. was truthful in her responses, and there is no indication in the record of evidence to negate the child's awareness that her therapist needed accurate information and that being truthful was in her best interest. *See Taylor*, 268 S.W.3d at 589. Finally, the statement was made in the context of therapy. *See id.* at 591. Thus, the trial court would not have abused its discretion in admitting the statement under rule 803(4) of the rules of evidence.

Further, a hearsay statement about abuse, which is defined to include a parent's drug use that causes physical, emotional, or mental harm to a child, *see* Tex. Fam. Code Ann. § 261.001(1)(I), is admissible if the trial court decides that the child's best interest would be best protected by allowing the statement into evidence. *Id.* § 104.006(2). J.C.C.'s statement to her therapist was about her witnessing her parents using drugs, which she said gave her a headache. The therapist also testified that J.C.C. would likely not have remembered an event from many months earlier unless it was significant and had a "big emotional impact on her." The therapist further testified that it would be harmful to J.C.C. for her to have to come to court to testify about what she had seen. Thus, the trial court would not have abused its discretion in admitting the evidence under section 104.006.[7] We overrule Calderon's fifth issue.

---

[7] Further, even if the trial court had erred in admitting the evidence, considering the overall weight of the evidence, Calderon has not shown that the evidence related to J.C.C. seeing "white powder" probably caused the jury to return an improper verdict. *See Owens-Corning Fiberglas Corp. v. Malone*, 972 S.W.2d 35, 43 (Tex. 1998).

15

We next evaluate the sufficiency of the evidence supporting the jury's determination that there were statutory grounds for termination and that termination was in the children's best interest.

Disregarding evidence of Calderon's criminal history or domestic disturbances that occurred before one or both of the children were born, there is legally and factually sufficient evidence to support the jury's findings that statutory grounds for termination existed. Calderon was in prison from August 2007 through March 2008 and again from May 15, 2008, until June 5, 2008. Those prison terms were due to Calderon's ongoing criminal activity or violations of parole terms. During his time in custody, Melendez's drug addiction worsened, resulting in the children's removal and placement in the Department's custody. Calderon knew or reasonably should have known that Melendez was struggling with drug abuse but took no steps to protect the children from neglect, such as finding another place for them to live. There was evidence that Calderon continued to be involved in criminal activity up until very recently before trial and that he may have involved his teenage stepson in an attempted theft. Calderon's therapist testified that he never took responsibility for the children's removal or for his own bad actions, and she believed that his lack of accountability made him a danger to children in his care. The police raid in February 2007 found drugs and a handgun in the house Calderon shared with the girls; the officers testified that the drugs, drug paraphernalia, and weapon were found in plain sight and within reach of children, not hidden away as Calderon insisted. Although charges were generally never brought, the police were called to the family's residence at least four times to respond to complaints of loud arguments or domestic disturbances. The day after Calderon was given custody of the children pursuant to the mediated settlement

16

agreement, under which he agreed not to allow Melendez to have visitation unless approved and supervised by the Department, Calderon drove the children to a store, where he allowed Melendez to get into the car and sit alone with the girls for some time. Finally, both Melendez and Calderon testified that they believed their behavior had endangered the children's well-being.

Viewing the evidence in the light most favorable to the jury's determination, we conclude that the jury could reasonably have reached a firm belief that Calderon knowingly placed or allowed the children to remain in conditions or with someone whose conduct endangered their well-being. *See id*. § 161.001(1)(D), (E); *J.F.C.*, 96 S.W.3d at 266. Similarly, considering the record as a whole, we cannot conclude that a reasonable jury could not have resolved the disputed evidence in favor of its determinations. *See J.F.C.*, 96 S.W.3d at 266. We overrule Calderon's first three issues.

As for the best-interest determination, there was testimony from J.C.C.'s therapist, the CASA volunteer, the CASA volunteer's supervisor, and the Department caseworker that termination was in the children's best interest and that the children need stability and finality, are very adoptable, and should not be left lingering in the foster system any longer than they already have. Although Calderon's most recent run-in with the law resulted in a plea bargain that did not require jail time, his on-going criminal activity could put the children at risk for further upheaval should the next incident result in a prison sentence. Finally, the children's attorney ad litem recommended termination. The evidence is legally and factually sufficient to support the jury's best-interest determination, and we overrule Calderon's fourth issue.

**Conclusion**

We have concluded that the evidence is sufficient to support the jury's determinations that there were legal grounds for termination of Calderon's rights and that termination was in the children's best interest. Further, we have held that the trial court did not err in allowing J.C.C.'s therapist to testify about J.C.C.'s statement related to seeing "white powder."

Finally, Melendez's attorney's brief presents a thorough and professional evaluation of the record and discusses and demonstrates why there are no arguable grounds for reversal. A copy of the brief was delivered to Melendez, who has neither sought other counsel nor filed a pro se brief. Having conducted an independent review of the record, we agree with Melendez's attorney's that her appeal is frivolous.

We affirm the trial court's decree terminating Calderon's and Melendez's parental rights.

_____

David Puryear, Justice

Before Justices Patterson, Puryear and Henson

Affirmed

Filed: June 11, 2010

18